Duane E. COZART and Jane Cozart, his
wife, et al., Plaintiffs-Appellants,

v.

GREEN TRAILS MANAGEMENT CORPO-
RATION, a corporation, et al.,
Defendants-Respondents.

No. 34741.

Missouri Court of Appeals,
St. Louis District,
Division 2.

Aug. 28, 1973.

Motion for Rehearing or Transfer Denied
Oct. 10, 1973.

Application to Transfer Denied
Dec. 10, 1973.

Armstrong, Teasdale, Kramer & Vaughan, Donald U. Beimdiek, Larry B. Luber, Edwin S. Fryer, St. Louis, for plaintiffs-appellants.

Ackerman, Schiller & Schwartz, Paxton H. Ackerman, Ziercher, Tzinberg, Human & Michenfelder, Clayton, for defendants-respondents.

SMITH, Presiding Judge.

Plaintiffs appeal from a judgment against them in a court-tried case in which they sought declaratory and injunctive relief. Plaintiffs are property owners in the Village of Green Trails in St. Louis County. Green Trails Management Corporation is an owner of land in the Village of Green Trails and one of the developers of the Village. Tpheris Israel Chevra Kadisha Congregation (hereinafter Synagogue) ·is a Missouri pro forma corporation and the owner of a tract of land in the Vil-

lage. The individual defendants are trustees or former trustees under an indenture of restriction of the Village.

In February 1965, the owners of the land in the area known as the Village of Green Trails filed of record an indenture of restrictions of the Village. These restrictions were to effectuate a master plan for the development of the Village and to comply with the Density Development Procedure Ordinance Section 1003.285 [1] (SLCRO) of St. Louis County. This somewhat complicated ordinance provides that subdivision developers may provide for lots of less than the minimum size otherwise required in the Residential District Zone, providing "common land" for open space or recreational use is set aside for common use by all the owners of the residential lots in the subdivision. "Common land" may, under the ordinance, be used only for "(a) private recreational facilities, such as golf courses or swimming pools, which are limited to the use of the owners or occupants of the lots located within the subdivision; (b) historic building sites or historical sites, parks and parkway areas, ornamental parks, extensive areas with tree cover, low land along streams or areas of rough terrain when such areas are extensive and have natural features worthy of scenic preservation."

This definition of "common land" was incorporated by reference into the indenture. These common lands were to be conveyed to the Park Trustees to be held by them for thirty years and thereafter the title in fee simple would vest in the owners of all lots as tenants in common. The powers of the Trustees were set out specifically and included the following:

"13. The Board of Park Trustees shall hold, maintain and keep in good order and repair the Common Lands when conveyances thereof are made to the Park Trustees.

"14. The Board of Park Trustees may in its discretion build and maintain in

1. Now Section 1103.183 S.L.C.R.O.

Common Lands playgrounds, paths, stables and such recreational facilities as the Park Trustees in their discretion shall determine . . .

"15. The Board of Park Trustees may from time to time make and amend such reasonable rules and regulations as they in their discretion may determine for the use of Common Lands (or portions thereof) and facilities owned by the Park Trustees . . ."

Contemporaneously with the recording of this indenture the owners filed for record the plat of Trails West (a portion of the Village of Green Trails). That plat showed the common lands and the streets in the subdivision.

On September 8, 1969, the Park Trustees executed and subsequently recorded a plat creating a roadway easement fifty feet wide over land originally platted as "common land" in Trails West. The plat also created an easement over adjoining land owned by Green Trails Management Corporation. That portion of the easement traversing common land and a portion of the private land was designated as "a perpetual roadway easement for the benefit of residents of the VILLAGE OF GREEN TRAILS and the tract of ground . . ." which was shortly thereafter acquired by the Synagogue. The remainder of the easement over private land was designated as a private roadway easement ". . . for the sole benefit of . . ." the Synagogue tract. The easement ran from Ladue Road, over the common land, through private land and through the northern edge of the Synagogue tract. The easement furnishes access to the Synagogue property from Ladue Road.

At approximately the same time, the Trustees and the Synagogue entered into a road and dam maintenance agreement which was also recorded. This document permitted the Synagogue to construct, at its expense, a paved road and sidewalk on the easement and on top of the dam and to grade or expand the dam (common land)

by filling as approved by the Park Trustees. The road and sidewalk were thereafter to be maintained by the Synagogue. The Trustees undertook the obligation to properly maintain the dam and the outfall pipe. The agreement also contained the following provisions:

"The road and sidewalks when completed may be utilized by the residents of the Village of Green Trails for access to the lake areas for *residential* purposes, *but may not be used for any other purpose without the consent of Synagogue.*" (Emphasis supplied.)

The parties also agreed to cooperate to prohibit parking on the easement.

Also in September 1969, upon the petition of the Management Corporation and the Park Trustees, the St. Louis County Council amended its order of August 6, 1964, which had approved the development of the Village of Green Trails Subdivision. The amendment eliminated from the calculation of the total number of lots permitted to be developed within the subdivision, the common land area over which the easement was granted.

On the same day the Road and Dam Maintenance Agreement was executed, the Synagogue acquired title to the tract served by the easement. Thereafter the Synagogue commenced grading of the easement area and plaintiffs followed with this suit seeking a declaratory judgment that the easement and maintenance agreement as they pertain to common land are void. They also sought injunctive relief requiring the Synagogue to cease all future construction and to affirmatively restore the common land to its prior condition.

Since this is an equity case we review the matter de novo and make our own determination of the law and the facts giving deference to the trial court's opportunity to judge the credibility of the witnesses. In this latter regard, however, we note that the determinative facts in this case were adduced through documents whose authenticity was agreed to by the parties.

■ The parties have joined issue on whether plaintiffs have properly shown that they adequately represent the class they purport to represent. The trial court found they did. We find the dispute academic. Plaintiffs were beneficiaries of the indenture of trust and any beneficiary may seek equitable review of the actions of the trustees. Young v. Lucas Construction Co., 454 S.W.2d 638[11] (Mo.App.1970). Whether the action was a proper class action or simply one by the joined beneficiaries, plaintiffs stated a cause of action and were entitled to have a court of equity determine the validity of the Trustees' action.

It is clear from the evidence, and not disputed by respondents, that the granting of the easement, the execution of the dam and maintenance agreement, the petition to the County Council, and the sale of a tract to the Synagogue were all interrelated transactions. The predominant purpose, clearly, was to provide the prospective purchaser, the Synagogue, with ingress and egress to its tract from Ladue Road. There is no contention here by respondents that such an easement was a way of necessity, it appears rather that it was a more convenient route than other possibilities.

■ It is, of course, Hornbook law that the powers of a trustee are limited by the terms of the trust. Those powers are strictly construed. Coleman v. Lill, 191 S.W.2d 1018 (Mo.App.1945). A trustee cannot change the nature of the use of the trust res. Carter v. Boone County Trust Co., 338 Mo. 629, 92 S.W.2d 647[17,18] (banc 1935). Discretion granted to a trustee must be construed with regard to the purpose of the trust and is not a roving commission. Plummer v. Brown, 315 Mo. 627, 287 S.W. 316[9] (banc 1926).

■ Putting aside for the moment whether the Trustees have the power to grant any easement to the Synagogue, we must first determine whether power can be found in the Trustees to build or authorize the building of a road over common land. We find no such authority on the facts before us. The only explicit building authority contained in the trust indenture is to build "playgrounds, paths,[2] stables, and such recreational facilities as the Park Trustees in their discretion shall determine." We do not believe "recreational facilities" includes roads, particularly in view of the types of recreational facilities enumerated and the definitions of use of common lands found in the County ordinance to which the indenture refers. We find no express power to build roads on common lands.

It is reasonable to conclude that under some circumstances the Trustees might have the implicit power to build a road through the common land. Such might occur where some valid recreational facility requiring vehicular access was being developed. Such implicit power can only arise where the road is necessary or at least convenient for the usage of a recreational facility authorized under the trust indenture.

■ Although the maintenance agreement says it is to provide access to the lake area, the evidence here does not support a finding that the proposed road is necessary for, convenient to, or intended to serve any recreational facility. The burden of proof to establish his fidelity to the trust is upon the trustee. Engelsmann v. Holekamp, 402 S.W.2d 382[12] (Mo.1966). Initially we note that respondents produced no evidence of a purpose to serve a recreational facility. The only evidence was from appellants and indicated that the proposed road made access to the lake more, not less, difficult, effectively interfered with the use of the common land for horseback riding, and reduced the attractiveness of the common land area. We also note that apparently no move for such road access was considered for five years

2. "Paths" here obviously refers to bridle or hiking paths. Bridle paths are shown on the original plat.

after the plat was recorded, and consideration of such road arose when the Synagogue became interested in purchasing a tract of land and wanted access to Ladue Road. The proposed road leads only to the Synagogue property and physically does not purport to provide vehicular access to most of the lake. Since parking is not to be permitted on the easement it is difficult to determine what, if any, access to the lake is provided. This is particularly true since the western half of the total easement is private and solely for the use of the Synagogue. Apparently an automobile could only drive along the road, turn around when it reached the Synagogue property and drive back. Nor do we agree that the easement can be justified, as the trial court did, because it provides pedestrian and bicycle access to the area. That access could just as well have been provided by the Trustees under their express authority to construct paths. The conclusion is inescapable that the road is intended to give access to the Synagogue property and not to any recreational facility. The record is devoid of any indication that residents of the Village needed, wanted, or had requested a road where proposed. The minutes of the Trustees' meetings are silent of any discussion concerning any proposed easement, or of any public indication that such was being considered. It became public as a *fait accompli*. At the time the transactions with the Synagogue were under way no member of the Board of Park Trustees had been selected by the residents of the Village, all were nominees of the developers.

■ Nor can we find support for the Trustees' action under their discretionary power to make rules and regulations for the use of the common lands. Again, such rules and regulations must find their genesis in a furtherance of valid trust purposes. And those purposes must be gleaned from the trust instrument. We cannot construe this grant as authorizing construction of facilities which are not otherwise authorized by the trust indenture.

■ The amendment by the County Council has no effect upon the powers of the Trustees under the indenture. Upon original approval of the plat by the County Council, the recording of it and the indenture, certain land in the subdivision became "common land" held in trust for all land owners in the subdivision. The County's action, five years later, excluding this land in determining compliance with the Density Development Ordinance could not divest the owners of their equitable (and eventually legal) title to the property previously platted as common land. Property rights cannot so easily be obviated. In passing, we note that the fact that the Trustees felt it necessary to request the County to eliminate the land in question from its previous order is strong evidence that they did not believe the use they intended to make of the land was an authorized use of "common land" under the ordinance, and by reference the indenture.

■ Having concluded that no power existed for the use of the common land to build the roadway contemplated, it of course follows that what they cannot do themselves, the Trustees cannot authorize or permit another to do. Beyond that, the Trustees have attempted to convey an interest in the common land. They have no power to convey common land under the indenture. In fact the indenture provides that its provisions may be modified from time to time by a two-thirds vote of the owners "except as such modification effects the title to the Common Lands." It is clear from the indenture that the title to those lands is beneficially in the owners and is to remain there until they obtain legal title as tenants in common. The granting of a perpetual roadway easement divests at least a portion of that title. In addition the maintenance agreement places in the Synagogue the ultimate determina-

tion of the use to be made of the road built upon the easement.[3]

This delegation is also beyond the power of the Trustees. It is at least questionable that under the County ordinance the Synagogue has the right or authority to use the common land at all for any purpose. That ordinance provides ". . . common land, containing one acre or more in area, for open space or recreational use may be set aside for common use by all the owners of *residential* lots in the subdivision . . ." (Emphasis supplied.) Although the indenture does not specifically set forth such a limitation, "common land" in the indenture is defined as that provided for in the County ordinance.

The easement grant and the execution of the road and dam maintenance agreement were beyond the powers of the Trustees and those documents are null and void insofar as they pertain to common land in the Village.

The injunctive relief sought by plaintiffs has never been passed upon by the trial court as it concluded the actions of the Trustees were proper. The equities involved in granting affirmative injunctive relief require a continuing supervision by the trial court and a determination of factual questions which this court is unable to decide on the record before us.

The cause is therefore reversed and remanded with directions to the trial court to enter a judgment declaring that the easement plat recorded in Plat Book 131, p. 18 [4] and the Road and Dam Maintenance Agreement recorded in Book 6419, pp. 2336–2341 insofar as they affect the Common Lands of the Village of Green Trails recorded in Plat Book 114, pp. 18–21 are null and void, and for further proceedings on plaintiffs' prayer for injunctive relief.

SIMEONE and KELLY, JJ., concur.

3. All owners are entitled to use it for "residential" purposes but since no residence can be built upon common land this provision is too ambiguous to have meaning. It is possible the parties meant "recreational" rather than "residential."

4. All books referred to are in the Office of the Recorder of Deeds of St. Louis County.