COUNTY OF RAY, Plaintiff,

Lloyd K. Basler and Thelma I. Basler, Intervenors,

Arthur J. Wuttke, Sr., Billie C. Wuttke, Richard W. Lagrow, Elizabeth I. Lagrow, Defendants-Appellants,

v.

C. Ray HEATH, Jay Criswell, Barbara Wilson, Joe L. Hoskins, Robert G. Barkley, Trustees of Crystal Lakes, Plaintiffs-Respondents.

No. WD 32424.

Missouri Court of Appeals, Western District.

July 6, 1982.

David H. Miller, Hill & Miller, Richmond, for defendants-appellants.

George Lehnen, III, Richmond, for plaintiffs-respondents.

Before SHANGLER, P. J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The plaintiff Ray County sued the defendants Heath and others as Trustees of Crystal Lakes, a residential subdivision within the county, to enjoin the closure of certain of its roadways against use by non-subdivision Ray County residents. The prayer for relief was premised on the pleaded contents of a letter from the Crystal Lakes developer to the county court that the roadways of the subdivision would be available for use to all residents and their guests of Ray County. In the course of the litigation, six subdivision property owners intervened for injunctive relief against the Trustees. The intervenors pleaded the effect of the letter and also premised the right to injunction on the allegation that the action by the Trustees to close certain of the entrances to the subdivision roadways violated the terms of the indenture of trusteeship and, hence, their fiduciary duty to the beneficiary property owners of Crystal Lakes. Then, on the motion of the defendants-Trustees, the court allowed the substitution of a person elected to that office since the institution of suit to replace the person whose office expired.

The court found against the contention of Ray County [and the intervenors] that all residents of the county were entitled to unregulated use of the subdivision roadways and denied injunction. The plaintiff Ray County does not appeal from that adverse judgment.

The court found that the Trustees were empowered under the indenture of trusteeship to close the roadway entrances of the subdivision against entry of nonowner traffic, allowed exercise of that power by the installation of movable gates and entrances, but enjoined any permanent barricades. The court further ordered that "each *resident* of the subdivision shall be entitled to a key or keys to such gate or barricade upon request to the Board of Trustees." [emphasis added] That order is appealed by the Wuttkes and the LaGrows, four of the original six intervenor suitors.

Crystal Lakes is a private subdivision in Ray County established by certain investors [one Erkenbeck, among others] as the Crystal Lakes Development Corporation. The owner corporation executed a Restrictive Covenants instrument appertaining to the use of the subdivision land which included an indenture of conveyance by the owner to Trustees of the land set apart as roads and other common facilities in the subdivision. The instrument [and, we assume, the plat] was recorded in Ray County on December 13, 1968. The power to provide for and to maintain streets, gateways, entrances and other common facilities in the subdivision has since been exercised by the Trustees, and not the Development Corporation. There is no provision for a police department or fire department in the instrument and those services are rendered by the Sheriff of Ray County and fire departments of Excelsior Springs and Woodheights, nearby.

The subdivision common facilities became subject to acts of vandalism: the bath houses and club houses were invaded, the plumbing was wrenched and torn, and the beaches were strewn with broken glass and other detritus. The cost to repair the damage that year was between $3,000 and $5,000. The budget for the total annual operations of the Trustees was about $38,000. The subdivision Treasurer estimated that the annual cost to post a security guard at each of the gates would be between $20,000 to $25,000. That scheme was deemed too costly, so in February of 1979, the Trustees circulated a survey letter to each property owner to determine the preference of the majority as to how many gates should remain open. To the 1200 or so inquiries [of that number, 70 were actual residents], 238 responses were received. Of that number, 17 favored one gate open, 110 favored two, 19 favored three, 3 favored four, 8 favored six,[1] and 5 favored that no gate remain open. A few others were returned unsigned.

The next month, in March of 1979, the Trustees took steps to reduce vandalism by the closure of gates B, C and F.[2] The access to the subdivision roads at those points was obstructed by cables strung from posts and other such means. Keys to the padlocks to these devices were kept by the Trustees and were furnished to the fire departments, the Excelsior Springs police department and the county sheriff. The security personnel on the subdivision were also given keys. There was always someone on the subdivision premises available to open the gates to a property owner. The gates remained open during the weekend when the facilities were most used. The trustees closed gates B, C and F from among the others because the remoteness of those entrances rendered those areas most vulnerable to unauthorized entry and van-

---

1.  The gates, situated along the perimeter of the subdivision, for ease of identification were designated A, B, C, D, E and F—six in all. In fact, D was not an entranceway, but led into a dead end.

2.  The subdivision is bordered on the west by Missouri Route Y and on the south by a county road. Gate F is located on Missouri Route Y at the extreme northeast corner of the subdivision. Main gate A opens on to Missouri Route Y near the southeastern corner of the subdivision. Gates B and C open on to the county road at the southern perimeter of the subdivision.

dalism. The main entrance, gate A, which opened onto Missouri Route Y, was always open and it is by that ingress that the fire department serviced the subdivision because the roads at the other entrances could not accommodate the equipment.

The barricades across gates B, C and F were maintained for about six weeks. The incidence of vandalism decreased during that time. The posts for the gates did not remain intact, however. They were despoiled repeatedly and the Trustees simply abandoned the attempt.[3]

The intervenors are owners of Crystal Lake property in the near vicinity of the county road and their most convenient point of access is gate B. They complain that the closure of gate B and gate C, also on the county road but somewhat more to the west, unduly impairs the enjoyment of their property. In particular, they complain that the most direct access to Excelsior Springs is via gates B and C, that the blockage of those ways entails travel over an additional mile and a half or more. They say also that when there is rain, access to the main gate A, to which the blockages divert their travel, becomes altogether impossible by a spillway over that road. They say also that at times of high water, the closed gates extend the response time of an emergency vehicle from Excelsior Springs by almost an hour. There was Trustee evidence, however, that at times of rain, *all* the gates—B and C included, remained open. Also, that the emergency services [the fire department of Excelsior Springs operated the ambulance] were given keys to any locked gate and that—in any event—they always used gate A by choice, an entrance never closed.

The intervenors contend implicitly that the evidence describes a threat by the Trustees to once again barricade entranceways to the subdivision, an invasion of their legal right to unhampered access to their proper-ty, and so proves the basis for an injunction. See *Higday v. Nickolaus*, 469 S.W.2d 859, 864[11, 12] (Mo.App.1971). The defendant Trustees contend that the closure of the several gates was a reasonable exercise of a power conferred by the indenture of trust. The judgment of the court to enjoin the Trustees from future blockage of the entranceway to the subdivision unless they furnished the *residents* upon request a key to the barricade adjudicated, in effect, the authority of the Trustees to regulate the traffic through the gates of the subdivision but that the authority was not reasonably exercised.

The adjudication rests amply on the express provisions of the indenture of trust component of the Restrictive Covenants instrument of conveyance between the developer-owners and the Trustee-grantees. That formal instrument conveys to the Trustees that land designated on the plat as roads, lakes, dams and other areas for common use to preserve the tract of land "as a restricted residential neighborhood" and "to foster the health, welfare, safety and morals of all who *own lots or reside* in said area" [emphasis added], among the other purposes. The indenture empowers the Trustees [Article I.1] "to construct, reconstruct, improve, contract for, maintain or repair streets or roadways" upon the land conveyed to them, to [Article I.5] "grant easements in, over, or under the streets, etc.," to [Article IV.5] "construct and maintain such boat dock facilities as they may deem necessary for the use and benefit of owners of lots in said subdivision," and to exercise numerous other authorities. The general powers of the Trustees are defined in Article IV. The first paragraph recites the encompassed power:

> The Trustees shall have the right and power to provide for and maintain tennis courts, playgrounds, gateways, entrances, drinking fountains, lakes, streams, and

---

3. The evidence, not altogether certain, intimates that gates B and C were the structures repeatedly pulled down—whether by vandals or by residents is not known. There was evidence by Trustee and Treasurer Barkley, and not otherwise contradicted, that the residents and regular users of gate F were unanimously agreed that the entrance should remain locked and to notify the keeper of the keys—Barkley—when anyone intended to use that entrance. The practice at gate F is now the same as at the others, and remains open.

other ornamental or recreational features in said subdivision on any lands set aside for the general use of the *owners* of the lots in said subdivision or to which said *owners* have access and the use thereof. [emphasis added]

The intervenors argue that the instrument of trust defines and limits the authority conferred, to which the trustee is strictly confined, and that the "general security and law enforcement in the subdivision" were simply not powers for trustee exercise by the terms of the trust indenture. They argue, specifically, that Article I.1 conveys the roadway landstrips to the Trustees only for purposes of construction, maintenance and repair and Article IV.1 empowers the construction and maintenance of gateways and entrances, but neither provision empowers the installation of barricades or other closures of the roadways. The law requires a trustee under an instrument of restrictive covenant and indenture of trust to act strictly in conformance with that definition of authority. *Ginter v. City of Webster Groves*, 349 S.W.2d 895, 901[6] (Mo.1961); *Cozart v. Green Trails Management Corporation*, 501 S.W.2d 184, 187[2–4] (Mo.App.1973). The role of a trustee is to discharge the trust purpose, as that imperative appears from the entire trust instrument. *Keener v. Berry*, 442 S.W.2d 159, 162[2–4] (Mo.App.1969). A concomitant of that preeminent Trustee function is the duty to protect the trust property against damage or destruction. To that end, the trustee "is obligated to the beneficiary to do all acts necessary for the preservation of the trust res" as would prompt a reasonable person under the circumstances of the nature and purposes of the trust property. Bogert, Trusts and Trustees § 582 (2d ed. rev. 1980).

The terms of a trust and restrictive covenants instrument executed as one are understood as one. *Ginter v. City of Webster Groves*, supra, l.c. 901[8]. The integral Crystal Lakes scheme creates a private community of distinctive quality for residence and recreation. It plans a restricted neighborhood around a lake. To

the end that the enjoyment of the property may be preserved for the lot owners and residents, the indenture conveys to Trustees the private roads, the common property and other easements. [Restrictive Covenants and Trust Indenture, Preamble]. The common facilities constructed by the Trustees under the general powers of the preamble and of Article IV.1 of the integral instrument included the lakefront beaches, the club houses, the boat houses and other installations depredated by vandals. Thus, the Trustees took title to these common areas for the benefit of the owners and residents of the subdivision [*Nemours v. Hickey*, 357 Mo. 731, 210 S.W.2d 94, 97[1] (banc 1948)] and were under duty to preserve the trust res in a manner compatible with the terms and purpose of trust.

We agree with the Trustees that the actual terms of the integrated instruments [as well as the obligation of law] empowered the initiative to secure the common property against destruction by the installation of gates and reasonable barriers. The preamble to the trust in the integrated instrument expressly declares that the purpose of the restrictive covenants is to preserve the tract as "a restricted residential neighborhood" to ensure the "health, welfare, *safety* and morals" [emphasis added] of the subdivision owners and residents—and that "the creation of a trust of certain of the property rights in said tract and of certain use restrictions are the most beneficial means of accomplishing this purpose." To those ends, the Trustees are empowered to [Article I.1] "construct, reconstruct, improve, contract for, maintain or repair streets and roadways"; to [Article IV.1] "provide for ... gateways, entrances ... on any lands set aside for the general use of the owners"; and to [Article IV.2] "care for and maintain ... the lake and lakefront ... and to do any and all other things necessary or desirable in the judgment of the trustees to keep ... said lake and lakefront neat in appearance and in good order." That to ensure the *safety* and other common benefits to owners and residents the scheme of mutual restrictions augured were the offi-

cial concerns of the Trustees is made clear by the declaration in Article IV.3: "The Trustees shall have the right and duty to enforce ... any and all restrictions which may now or which may hereafter be imposed upon any of the lots in the subdivision." The instrument expressly empowered the Trustees to install gateways, to construct and maintain roads and recreational facilities, and to do any and all things to maintain the lakefront in good order. The lakefront—the beaches and the bathhouses projected onto the lake—were objects of recurrent vandalism. The installation of the gateways [4] to protect the safety of the residents and owners and the good order of the common lakefront property, therefore, was an express grant of the trust.

We agree also with the court that any installation at a road entranceway of a nonmovable barricade is beyond the authority of Trustee. That is because a *gateway*, by very definition, presupposes closure by means of "a movable frame or door." [n.4] We conclude nevertheless, that the judgment of the trial court to enjoin the Trustee unless the barricades at the entrances are by movable gates to which "each resident of the subdivision shall be entitled to a key" upon request is too narrow. The adjudication redresses only a *resident* in the subdivision, whereas the terms of the restrictive covenants and trust indenture recurrently declare that they are for the benefit of the *owners or residents*. Two of the intervenors on appeal, the Wuttkes, are owner-nonresidents of the subdivision. The duty of the Trustees is owed them under the terms of the trust, as well as an owner even if not resident, and so is the decree of the court.

The intervenors cite a number of cases for the principle that a trustee is bound to perform in strict accordance with the instrument which determines the trust powers and duties. Thus, a Trustee of a subdivision common property may not alienate any of the trust res to private uses—as by the dedication of that property as a roadway for use of a church [*Cozart v. Green Trails Management Corporation*, 501 S.W.2d 184 (Mo.App.1973), also *Georg v. Koenig*, 387 S.W.2d 259 (Mo.App.1965)]—or do any act the trust instrument does not empower—such as to levy assessment for street repair and planted shrubbery when the terms of the trust confine that practice to the enforcement of building restrictions [*Coleman v. Lill*, 191 S.W.2d 1018 (Mo.App. 1945)]. We apply the rule of law the intervenors assert to find that the integral restrictive covenants and trust indenture empower the Trustees to install gates at the entrances to the subdivision roadways to preserve the common property held for the benefit of the owners or residents—but by a *reasonable* exercise.

The original suitor, Ray County, pleaded the theory that the residents of the county were entitled to the unregulated use of the subdivision streets on the basis of a declaration to that effect in a letter from the developer of the subdivision to the county court. The trial court gave that evidence no effect and rejected the petition of that plaintiff to enjoin the Trustees from the installation of any barrier to hamper the free traffic by the county residents over the subdivision roads. The plaintiff Ray County did not appeal the adverse adjudication. The intervenors plead the same theory and assert the same evidence. Their petition acknowledges [as did the Ray County pleading] that the Crystal Lakes subdivision is a private residential enclave and that "the said roadways and intersections are not public roadways but reserved to the use of the [development]." The claim of the county public to use the roads rests altogether on the letter from the Crystal Lakes Development Corporation to the judges of the Ray County Court. That letter [from Erkenbeck as president of the corporation] does indeed hold out that "all residents of Ray County and their guests shall be permitted to use the roads constructed by the company for through trav-

---

4. *Gateway*: "a supporting frame or arch in which a gate is hung."

   *Gate*: "an opening for passage in an enclosing wall, fence, or barrier; *esp.*: such an open-

ing with a movable frame or door for closing it."

Webster's Third New International Dictionary, Unabridged (1961).

el." That declaration was under date of September 25, 1969. The restrictive covenants and trust instrument [also executed by Erkenbeck as president of the development corporation] was already on record for almost a year by that time [filed with the Recorder of Deeds of Ray County on December 13, 1968]. When the Erkenbeck letter issued, therefore, the corporation had since conveyed the subdivision roadways to the Trustees for the private uses defined in the instrument of mutual restrictions, conveyance and trust. The legal title was in the Trustees. They were bound by the terms of the integral instrument to exercise their trust in strict accordance with the definition of powers and duties—that is, to hold the roadways and other common property for the private purposes of subdivision and for the benefit of the owners or residents of Crystal Lakes. The tender by Erkenbeck to the county court was gratuitous.

The judgment of injunction is modified to direct the Trustees to provide an owner of subdivision property, even though not resident, with a key to any movable gate or barricade installed to protect the common property.

The judgment is affirmed as modified.

All concur.

Thomas M. Sullivan, Kansas City, for defendant Starr.

I. L. Kraft, Kansas City, for cross-claimant/successor trustee-respondent United Missouri Bank.

John H. Foard, Jr., Kansas City, for defendant-appellant Moreland.

Elwyn L. Cady, Jr., Independence, pro se.

Before NUGENT, P. J., and TURNAGE and LOWENSTEIN, JJ.